UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DOMINIC M. MONARITI, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CASE NO. 4:16-CV-626 |
| NANCY A. BERRYHILL, Acting | § | |
| Commissioner of the Social Security | § | |
| Administration, | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

## MEMORANDUM OPINION

Plaintiff Dominic M. Monariti seeks judicial review of a final decision of the Acting Commissioner of the Social Security Administration ("the Commissioner") denying his application for Social Security disability insurance benefits. The Parties consented to have this Court conduct all proceedings in this matter pursuant to 28 U.S.C. § 636(c) and filed cross-motions for summary judgment. ECF Nos. 5, 7–9. For the reasons given below, the Court **GRANTS** Plaintiff's motion, **DENIES** the Commissioner's motion, **REVERSES** the ALJ's non-disability finding, and **REMANDS** the case to the Commissioner for the immediate calculation and award of benefits.

## I. BACKGROUND

### A.    Procedural Background

On August 9, 2011, Plaintiff applied for disability insurance benefits and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("the Act"). R. 236–48.[1] The Social Security Administration ("SSA") denied his application initially and

---

[1]  "R." citations are to the electronically-filed record, ECF No. 4.

1

upon reconsideration. R. 131–41. Pursuant to Plaintiff's request, a hearing was held on October 3, 2012 before Administrative Law Judge Patricia C. Henry ("the ALJ"). R. 65–95. Plaintiff, who was represented by counsel, testified at the hearing, as did a vocational expert. On October 26, 2012, the ALJ issued an unfavorable decision, concluding that Plaintiff was not disabled during the relevant period and therefore not entitled to the benefits for which he applied. R. 104–120. Plaintiff appealed the ALJ's decision to the SSA's Appeals Council. On April 26, 2013, the Appeals Council granted Plaintiff's request for review, vacated the ALJ's decision, and remanded the case for the ALJ to provide "[a] more comprehensive discussion of the impact of [Plaintiff's] mental limitations on [his] residual functional capacity" and "further evaluation" of the opinion of Dr. Syed V. Ahmed, M.D., a consultative examiner. R. 126–30. The ALJ held a second hearing on April 9, 2014. Plaintiff, who was represented by counsel, again testified at this hearing, as did a vocational expert. On August 15, 2014, the ALJ issued a written decision in which she once more found Plaintiff not disabled within the meaning of the Act. Plaintiff timely appealed to the Appeals Council, which denied his request for review. R. 1–4.

Plaintiff then filed his complaint in this case, seeking judicial review of the Commissioner's denial of his Title II and Title XVI claims for benefits. Plaintiff argues that the ALJ erred in (1) relying on the medical opinions non-examining physicians issued in 2011, and (2) failing to adequately explain why she did not accept the medical opinions examining physicians issued in 2013. PL's Compl., ECF No. 1.

## B.    Factual Background

Plaintiff asserts that he suffers from both physical and mental disabilities. In his applications for disability benefits, Plaintiff stated that he had been disabled since

January 1, 2007. R. 240. Between 2003 and 2010, Plaintiff asserts that he previously received disability benefits. R. 34–35, 77.

## 1. Plaintiff's Work History

Plaintiff was born on December 30, 1969. R. 645. He completed his education through the ninth grade; he subsequently received a GED. Plaintiff completed two years of coursework at Houston Community College, where he studied criminal justice. R. 645-46. Until 2003, Plaintiff had been employed "since [he] was 12," when he began selling newspapers. He stated that he "worked for the Houston Chronicle and for the Houston Post most of [his] life." R. 70. From 1982 to 1993, he worked as a crew manager for a newspaper. Between 1993 and 1996, Plaintiff worked as an assistant manager at a car wash. In 1996, he began working as a door-to-door sales representative. R. 292–95. In 1999, after he "got hurt at work," Plaintiff began experiencing chronic pain. R. 73. Even so, Plaintiff continued to work as a sales representative until 2003, when he suffered from antifreeze poisoning and spent one month in a coma. Describing his work duties at the time of this incident, Plaintiff stated that he went "door to door, business to business demonstrating products and dropping off magazines and stuff." R. 68. In 2003, the year in which Plaintiff was poisoned, he earned only $5,701.15.[2] R. 267.

Since his coma in 2003, Plaintiff has been employed sporadically. In 2005, after spending a year on dialysis, he worked for "a very short period of time" selling newspaper subscriptions. In 2006, he again tried to sell newspaper subscriptions. R. 70–71. He explained: "I think I went—I tried to go back twice. But it's just too strenuous to climb up and down the stairs because you have to work apartment complexes and go all the way up to the third floor and all the way back down to the first floor and all the way back up to the third floor." R. 70. In 2009,

---

[2] For the sake of comparison, in 2001, his income reached a high of $45,463.36. R. 267.

Plaintiff "worked at a car wash for like a week or two." He was unable to continue working at this job, stating: "I can't even wash a car now. I used to be able to wash 100 or something cars." R. 37. Plaintiff explained that his physical and mental impairments made working at a car wash very difficult: "I couldn't take care of the clients first of all the way I used to. And then second it was too much pain to wash cars." R. 38. In 2009, he also briefly worked as a realtor. R. 277. Plaintiff stated that although he had a real estate license, this venture was unsuccessful. R. 87. After October 2009, Plaintiff did not seek further employment. R. 276. His income in 2009 was $479. R. 267.

### 2. Plaintiff's Medical History

In 1999, after an accident at work, Plaintiff developed chronic pain in his left shoulder. R. 428. In 2003, an ex-partner poisoned Plaintiff with antifreeze. Plaintiff spent one month in a coma. He suffered renal failure, and after waking from the coma, he was on dialysis for about one year. R. 68–69. In 2014, more than a decade later, Plaintiff described his kidneys as "barely functioning." R. 53. After the coma, he had to "[re]learn to walk and talk and everything." Plaintiff's chronic pain worsened "after the coma." R. 73. He stated that he had "never been the same since." R. 336. Plaintiff also experienced cognitive difficulties following the coma, explaining: "After the coma I have a really bad memory." R. 70. He stated that he could not "think straight" since the coma. R. 285.

Since 2003, Plaintiff has sought treatment from many doctors. On October 21, 2004, Dr. Cheng-Ti Judy Dai, M.D. ("Dr. Dai") diagnosed Plaintiff with neck pain, degenerative disc disease of the cervical spine, and cervical radiculopathy.[3] Dr. Dai performed epidural steroid injections on Plaintiff. R. 454–55. In 2005, Plaintiff was diagnosed with HIV. He clarified that

---

[3] Degenerative disc disease of the cervical spine refers to a degenerative process causing radiating pain, numbness, and weakness in an individual's shoulders, arms, and hands. Cervical radiculopathy refers to damage of nerve function, caused when one of the nerve roots near the cervical vertebrae is compressed.

he had contracted HIV from "a different partner" and his diagnosis was "unrelated to the poisoning." R. 81.

On March 25, 2007, after catching his neck and shoulder in the door jamb of his car, Plaintiff first sought medical treatment from Dr. Everton A. Edmundson, M.D. ("Dr. Edmundson"). He described his pain, in his "wrist, leg, ankles, [and] back," as "depressing" and "miserable." R. 453. The following day, on March 26, 2007, Plaintiff again told Dr. Edmundson that he was experiencing pain in his shoulder, low back, wrist, left leg, and both ankles. While his pain began following a work accident in 1999, Plaintiff explained, it "became worse gradually" and was now "constant, stabbing, [and] throbbing." Plaintiff's pain was "aggravated by movement," although it was alleviated by "massage and showering." R. 428. Dr. Edmundson diagnosed Plaintiff with fibromyalgia.[4] R. 432. During a follow up visit on April 24, 2007, Plaintiff told Dr. Edmundson that he "ache[d] all over," especially in his wrists and shoulder. R. 466. Dr. Edmundson prescribed Neurontin, an anticonvulsant used to treat nerve pain, and Norco, a narcotic pain reliever. R. 467. On July 16, 2007, Dr. Edmundson additionally diagnosed Plaintiff with cervical radiculopathy and prescribed Valtrex, an antiviral drug. R. 465. On October 3, 2007, Plaintiff told Dr. Edmundson that he still "[hurt] all over." R. 462. Dr. Edmundson then prescribed Lyrica, an anticonvulsant used to treat nerve pain. R. 463. On February 12, 2008, Plaintiff sought further treatment from Dr. Edmundson. Plaintiff reported that he could not "get relief" from his pain. Dr. Edmundson, who noted that Plaintiff appeared to have an "opiate dependence," instructed Plaintiff to continue taking Neurontin. He additionally prescribed Tofranil, an antidepressant. R. 461.

On August 30, 2008, Plaintiff fell and fractured his wrist. He sought treatment from

---

[4] Fibromyalgia is a chronic pain disorder that causes widespread musculoskeletal pain all over the body. It may also cause fatigue and memory issues.

Dr. Edmundson for this injury on September 3, 2008. Dr. Edmundson noted that Plaintiff had also sustained contusions to his chest and ribs. R. 458–59. During a follow up visit on December 31, 2008, Dr. Edmundson reported that Plaintiff's wrist had collapsed, leading to "a wrist deformity and significant pain." R. 456.

Between 2009 and 2011, Dr. Edmundson continued to treat Plaintiff. On May 4, 2009, Dr. Edmundson diagnosed Plaintiff with restless legs syndrome.[5] R. 447. On May 11, 2010, Dr. Edmundson referred Plaintiff to Dr. Stephen B. Chiang, M.D. ("Dr. Chiang"), citing an "unspecified polyarthropathy or polyarthritis involving multiple sites." R. 408.[6] After conducting a bone scan, Dr. Chiang confirmed that Plaintiff had "mild degenerative uptake . . . in the shoulders, spine, and knees." R. 403.[7] Dr. Edmundson prescribed a variety of medications to treat Plaintiff's chronic pain. On September 28, 2010, for example, when Dr. Edmundson treated Plaintiff for fibromyalgia and restless legs syndrome, Plaintiff was taking Norco, Ibuprofen (a nonsteroidal anti-inflammatory drug), Trazadone (a sedative and tetracyclic antidepressant), Soma (a muscle relaxant), Tramadol (a narcotic pain reliever), and Neurontin. R. 398, 435. On March 22, 2011, Dr. Edmundson noted that Plaintiff was additionally suffering from myalgia and peripheral neuropathy due to "anti-freeze poisoning, which also caused renal failure." R. 468.[8]

On May 26, 2011, Plaintiff was in a motor vehicle accident. He visited the emergency room at Methodist West Houston Hospital several weeks later. There, Dr. Darnell Pettway, M.D. ("Dr. Pettway") diagnosed Plaintiff with "back and neck pain." Dr. Pettway prescribed Toradol and Mobic, both nonsteroidal anti-inflammatory drugs. R. 479, 584–85. During a follow up visit

---

[5] Restless legs syndrome is a disorder that causes uncomfortable sensations in the legs, including an irresistible urge to move the legs. These symptoms especially occur in the evening, or whenever a person is trying to rest.

[6] Polyarthritis refers to a type of arthritis that involves five or more joints simultaneously.

[7] Uptake refers to the presence of degradation in the bone.

[8] Myalgia refers to muscle pain. Peripheral neuropathy is a condition in which the peripheral nervous system is damaged. The peripheral nervous system transmits information between the brain and other parts of the body.

with Dr. Edmundson on July 18, 2011, Plaintiff presented with "polyarthritis, whiplash injury, headache, and lower back pain." He told Dr. Edmundson that his chronic pain had worsened since his recent accident. R. 471. Dr. Edmundson instructed Plaintiff to continue his "current analgesic program," referring to the medications Dr. Pettway prescribed. R. 479.

After July 2011, Plaintiff no longer sought treatment from Dr. Edmundson because, even though the trigger point injections helped his pain, he could not afford it once he lost his Medicare benefits. R. 80–81. Instead, Plaintiff sought treatment at "county facilities [and] the Legacy [Community] Health Clinic." R. 80.

Plaintiff had previously visited Legacy Community Health ("Legacy") for mental health treatment. Since 2005, he stated, "four or five different mental professionals at Legacy" treated him. R. 85. During a June 25, 2009 visit to Legacy, Dr. Natalie N. Vanek, M.D. ("Dr. Vanek") treated Plaintiff for depression and chronic pain. Dr. Vanek, who noted that Plaintiff exhibited "blunted" affect, "average range" intelligence, "fair" insight, and "fair" judgment, diagnosed him with depression, HIV, and chronic pain. While Dr. Vanek also diagnosed Plaintiff with an opioid dependence, she characterized this dependence as iatrogenic, or the unintended result of Plaintiff's medical treatment for chronic pain. R. 491–92. Plaintiff was assessed as having a Global Assessment of Functioning ("GAF") score of 50, indicating a serious impairment. Dr. Vanek prescribed Pristiq, an antidepressant. R. 493. During a subsequent visit to Legacy on October 20, 2010, Plaintiff complained of continuing depression and "angry outbursts." A clinician, who diagnosed Plaintiff with depression, opioid and sedative dependence, HIV, and chronic pain, prescribed Cymbalta, an antidepressant, and Risperdal, an antipsychotic medicine used to treat mood disorders and irritability. R. 490.

When Plaintiff returned to Legacy for a follow up visit on November 11, 2010, a

clinician observed that he had "improved in every sector." The clinician instructed Plaintiff to continue taking Cymbalta and Risperdal and "wean [off of] opioids as tolerated." R. 494. However, Plaintiff was unable to discontinue his use of opioids. On February 10, 2011, when Plaintiff returned to Legacy, a clinician described him as "wired [and] drug-seeking" and "focused primarily on seeking opioids." The clinician told Plaintiff that Legacy would not prescribe opioids. Plaintiff "became verbally aggressive" and "threatening, profane, [and] physically intimidating." R. 497. During a subsequent visit to Legacy on August 20, 2011, a clinician reported that Plaintiff had continued to take opioids for chronic pain and fibromyalgia. R. 495-96. On August 30, 2012, Dr. Vanek reported that Plaintiff "asked for [her] to write [a prescription for] pain meds." She "refused." R. 596.

Plaintiff made clear that his pain negatively impacted his mental health. On July 16, 2012, Plaintiff told a clinician at Legacy that his "daily chronic pain" contributed to his bad mood. R. 599. The following month, on August 27, 2012, he again stated that his chronic pain "cause[d] him to be depressed." The clinician characterized Plaintiff's opioid dependence as "stable," and instructed him to continue taking Cymbalta, Ambien (a sedative), and Abilify (an atypical antipsychotic). R. 597.

In the fall of 2012, Plaintiff briefly sought treatment for his chronic pain from Dr. Joseph Segel, M.D. ("Dr. Segel"). During a visit to Dr. Segel on September 12, 2012, Plaintiff complained of pain in his shoulders and "knees on down." He described his pain as "aching, continuous, sharp, nagging, stabbing, penetrating, shooting, unbearable, throbbing, burning, pulsing, and cramping." At that time, Plaintiff was taking Norco, Soma, and Xanax. R. 614. During a follow up visit to Dr. Segel on November 21, 2012, Plaintiff complained of "aching, constant, and sharp" pain. Importantly, Dr. Segel did not observe any "potential aberrant drug

related behavior" from Plaintiff, and noted his "overall impression" that opioids were benefiting Plaintiff. R. 615. On December 24, 2012, Plaintiff told Dr. Segel that without pain medication his pain was "horrible," while pain medication made his pain better. R. 616.

Although Dr. Segel was of the opinion that prescribed opioids were benefiting Plaintiff, other physicians expressed concern regarding Plaintiff's opioid dependence. On January 14, 2013, Dr. Ken Masters, M.D. ("Dr. Masters") at Legacy characterized Plaintiff as having a "[history] of opioid abuse." R. 622–23. On March 6, 2013, Dr. Masters described Plaintiff as "blunted in affect with monotone voice." Plaintiff told Dr. Masters that he was "hanging in there," but "things [had] gone from bad to worse." R. 625. Dr. Masters, who described Plaintiff as "anxious [and] depressed," prescribed Celexa, an antidepressant, and Clonazepam, a benzodiazepine and sedative. R. 626. Dr. Masters emphasized that, if Plaintiff took more Clonazepam than prescribed, his prescription would not be continued. However, Plaintiff denied abusing benzodiazepines. R. 625. During follow up visits on September 10, 2013 and April 8, 2014, moreover, Dr. Masters reported that Plaintiff had only a "remote [history] of opioid abuse." R. 729, 768.

### 3. Plaintiff's Testimony

At the 2014 hearing, Plaintiff testified that he lived with a partner. He had no personal income, so "[his] mom mainly" supported him financially. R. 38. Plaintiff's daily activities were limited. He "tr[ied] to get up at like 10:00 [in the morning]." Plaintiff did not "typically shower every day," although he reported being physically able to do so. R. 39. Plaintiff did "not really" sleep through the night, reporting that he "had to take [his] medication to sleep through the night." *Id.* Light housekeeping tasks were "too strenuous" for him. R. 41. Plaintiff did not prepare meals, wash dishes, fill the dishwasher, do laundry, take out the trash, go grocery

shopping, or mow the lawn, although he did drive locally. R. 40–41. He explained: "I'm sure if I tried [to perform household tasks] I could but it would hurt." R. 52.[9]

Plaintiff's physical and cognitive impairments similarly limited his leisure activities. He "sometimes" watched television. R. 41.[10] Plaintiff testified that he "just check[ed] emails" on the computer because more prolonged computer usage "hurt [his] shoulder." R. 41–42. Plaintiff did not "read newspapers, books, [or] magazines." R. 42. He explained that reading was difficult because of his cognitive impairment: "I can't because I'll get through one sentence and I don't know what the sentence was." R. 48.[11] Plaintiff stated that he frequently forgot his passwords. He explained: "I forget my pass codes [sic], passwords. For example, for Yahoo I have to call them and act like an idiot . . . Even if I write them down I'll lose where I write them down." Moreover, Plaintiff often got lost: "I just got lost today five times getting here." *Id*. He described the impact of his cognitive impairment in the following terms: "I forget people's names. I forget what I did. I forget yesterday. I forget the day before yesterday." R. 52.

To alleviate his pain, Plaintiff "soak[ed] in the bathtub" and "[sat] in a massage chair." R. 42.[12] In a typical day, Plaintiff "[took] his medication and wait[ed] to die." R. 41. While Plaintiff's treating physicians had tried for years to treat his pain without resorting to medication, their efforts had been largely unsuccessful. At the 2012 hearing, he explained: "They've done

---

[9] Plaintiff's 2014 testimony suggested deterioration in his condition since the 2012 hearing. At the 2012 hearing, Plaintiff reported that he did not do any housekeeping, but he did rinse dishes and grocery shop "just for simple things" such as "bread or turkey meat." R. 75. He did not prepare his own meals, although he could "open a can of soup." R. 74.

[10] At the 2012 hearing, on the other hand, Plaintiff estimated that he watched five hours of television per day, suggesting deterioration in his condition between the two hearings. R. 76.

[11] At the 2012 hearing, on the contrary, Plaintiff had attributed his infrequent reading to his poor vision and did not mention any cognitive difficulties. R. 76.

[12] At the 2012 hearing, Plaintiff similarly stated that he "tr[ied] to stay on the massage chair or soak in a hot Jacuzzi bath to ease the pain." R. 76. During that earlier hearing, Plaintiff described his pain in the following terms: "It radiates from my shoulders down to my back. And it stops at my hips. And then it continues. It starts back at my knees and goes down to my feet." R. 72.

bone scans. They've done MRIs. They've done injections. They've done everything they can possibly do. I went to a neurosurgeon and he said the discs weren't separated enough to be operated upon . . . So basically they're just treating me with lots of medications." R. 72. However, his medication caused "side effects like drowsiness" and magnified his cognitive impairment. Plaintiff explained that his prescribed medications "kind of scramble[d] [his] mind a little bit." R. 38–39.[13] Moreover, pain medication did not provide Plaintiff with complete relief of his physical symptoms. Narcotics, such as Hydrocodone, were "like a band aid." Although they provided some pain relief, Plaintiff explained, the pain "still [bled] through." R. 50.

### 4. Assessments of Plaintiff's Physical and Mental Impairments

Before the 2012 and the 2014 hearings, Plaintiff was examined for his mental and physical condition. In each instance, the examination was performed at the request and expense of the Department of Assistive and Rehabilitative Services ("DARS"). These assessments revealed that Plaintiff's overall condition had worsened over time.

#### a. Examining Consultative Physicians' Assessments Before the 2012 Hearing

In advance of the 2012 hearing, at the request and expense of the DARS, two medical experts examined Plaintiff. On October 12, 2011, Dr. Frank A. Fee, Ph.D. ("Dr. Fee") performed a psychological evaluation of Plaintiff at Propsych Testing. Plaintiff, who was "on psychotropic medication" during the evaluation, told Dr. Fee that he "experienced health problems at birth," as well as childhood physical and sexual abuse. R. 530–31. As a child, Plaintiff stated, he fell on rocks at a lake and lost consciousness. At the age of twelve, Plaintiff was hit by a car and confined to a wheelchair for three months. R. 31. Plaintiff described his current pain as "a full body migraine." *Id.* Plaintiff remarked: "I'm in so much pain I asked the doctor, where is

---

[13] At the 2012 hearing, Plaintiff similarly complained that his medication caused fatigue. R. 84.

Dr. Kevorkian when you need him." R. 533. Plaintiff described the impact of his cognitive impairments on his daily life and leisure activities, explaining: "I can't pay attention even to a movie; it's depressing. Others will be laughing and I don't even know what's going on." R. 532. Dr. Fee assessed Plaintiff as having "fair" short-term and long-term memory and "somewhat impaired" concentration. Plaintiff was "unable to correctly complete simple arithmetic problems in his mind beyond addition and subtraction" and "unable to spell the word 'world' backwards on two separate attempts." R. 533. Dr. Fee diagnosed Plaintiff with a pain disorder, not otherwise specified ("NOS") and a mood disorder NOS. R. 534.[14]

On October 20, 2011, Dr. Syed Ahmed ("Dr. Ahmed") conducted a physical examination of Plaintiff. He reported a "history of frequent bronchitis, chest infections, [and] cough," as well as "shortness of breath and wheezing even at rest." Plaintiff also reported "poor energy level all day." Plaintiff told Dr. Ahmed that he had been "involved in [a] motor vehicle accident about five times." He was in "pain all the time" and "all over [his] wrists, head, shoulder, knees, and legs." R. 541. X-rays showed degenerative changes involving the acromioclavicular joint, including narrowing of the intervertebral disc space and marginal osteophyte formation. R. 537.[15] Dr. Ahmed assessed Plaintiff as having "clinically moderately severe low back pain" with a "possible degenerative etiology," "moderately severe disease of the bilateral shoulder joints, likely due to arthritis and/or tendinitis," "moderately severe neck pain, probably due to disc disease," "headache…probably due to cervical spine disease," and "mild to moderate" fibromyalgia. Plaintiff could sit for long periods of time only if he was allowed to stand and

[14] NOS is used to indicate that a person meets the general guidelines for a disorder but does not meet all of the specific diagnostic criteria for the disorder.

[15] The acromioclavicular joint is a joint at the top of the shoulder. Narrowing of the intervertebral disc space is a symptom of degenerative disc disease. An osteophyte formation is a bone spur. A marginal osteophyte formation refers to a small version of a bone spur.

stretch periodically. He could stand for a "moderate length of time" and walk a "moderate distance." Plaintiff could "handle light weights" only if he did not have to bend his back. R. 543.

*b. Non-Examining Consultative Physicians' Assessments Before the 2012 Hearing*

In advance of the 2012 hearing, two non-examining state agency consultative physicians conducted assessments of Plaintiff's mental and physical status. Both non-examining physicians concluded that the medical record as a whole did not support Plaintiff's reported symptoms and limitations.

On November 8, 2011, Dr. Mark Boulos, M.D. ("Dr. Boulos"), a non-examining state agency consultative physician, conducted an assessment of Plaintiff's mental status. Dr. Boulos characterized Plaintiff's mood as "mildly dysphoric," his "general fund of information and intelligence" as "average," and his "concentration and attention" as "somewhat impaired." R. 560. Dr. Boulos assessed Plaintiff as experiencing a "mild degree" of restriction of activities of daily living, a "mild degree" of difficulties in maintaining social functioning, and "moderate" difficulties in maintaining concentration, persistence, or pace. R. 558. Plaintiff could "understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for extende[d] periods, interact adequately with co-workers and supervisors, and respond appropriately to changes in routine work settings." R. 564. Dr. Boulos diagnosed Plaintiff with a mood disorder NOS, R. 551, and a pain disorder NOS, R. 554. He concluded that Plaintiff's "alleged limitations due to mental symptoms" were "not fully supported" by his medical record. R. 564.

On November 9, 2011, Dr. Maryam Saif, M.D. ("Dr. Saif"), a non-examining state agency consultative physician, conducted an assessment of Plaintiff's residual functional capacity ("RFC"). Dr. Saif assessed that Plaintiff had "moderately severe low back pain,"

"degenerative change" in his shoulder, "moderately severe neck pain, probably due to disk [sic] disease," including "degenerative changes," headaches "probably due to cervical spine disease," and "mild to moderate" fibromyalgia. R. 573. Despite these physical impairments, however, Dr. Saif concluded that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for a total of "about 6 hours in an 8-hour workday," and sit for "about 6 hours in an 8-hour workday." According to Dr. Saif, Plaintiff possessed an unlimited ability to push or pull. R. 567. Plaintiff was able to perform the following activities frequently: climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. Plaintiff was never able to climb ladders, ropes, or scaffolds. R. 568. Plaintiff was able to engage in unlimited handling, fingering, and feeling, although he could only engage in "limited overhead activity." R. 569. Echoing Dr. Boulos, Dr. Saif noted that Plaintiff's reported physical symptoms were "not wholly credible or supported by medical evidence." R. 571.

    *c. Assessments by Examining Consultative Physicians Before the 2014 Hearing Reveal Worsening of Plaintiff's Impairments*

After the 2012 hearing, further assessments conducted in 2013 revealed a worsening of Plaintiff's mental and physical impairments.

On September 27, 2013, at the request and expense of the DARS, Dr. Andrea Pellegrini, Psy.D. ("Dr. Pellegrini"), conducted a mental status examination of Plaintiff. R. 645–51. Plaintiff reported a "history of mood related symptoms [including] significant depressive symptoms." He "appeared lethargic, with slurred speech, and unsteady gait." Dr. Pellegrini attributed Plaintiff's appearance to his "medication use." R. 646. Plaintiff reported that his mental symptoms had "increased in intensity." R. 647. Intelligence testing of Plaintiff revealed a Pictorial Intelligence Quotient of 75 (fifth percentile), a Geometric Intelligence Quotient of 72 (third percentile), and a Nonverbal Intelligence Quotient of 71 (third percentile). These scores fell within the "poor"

range. R. 648. According to Dr. Pellegrini, Plaintiff demonstrated "significantly slowed and somewhat tangential thinking," "dysphoric and lethargic" mood, "fair to inadequate" memory and concentration, and "fair to limited" judgment. R. 650. Dr. Pellegrini concluded that Plaintiff would have "significant difficulty sustaining concentration and persisting in work related activities at a reasonable pace" and "moderate" difficulty interacting with supervisors and coworkers. R. 652–53.[16] At the same time, Dr. Pellegrini raised the possibility that Plaintiff's "lethargy and distractibility" were "medication induced," noting that "without extensive painkillers/sedatives," Plaintiff's "functional capacity would improve significantly." R. 650, 653.

On October 31, 2013, at the request of Dr. Masters at Legacy, Dr. Angela Larery, Ph.D. ("Dr. Larery") conducted a neurological examination of Plaintiff. Plaintiff reported "difficulty remembering both recent and past events, forgetting familiar people's names, and frequently misplacing items." R. 714. Dr. Larery assessed Plaintiff as possessing borderline-impaired overall intellectual functioning. R. 715. Plaintiff's ability to "sustain attention, concentrate, and exert mental control" was average, although his ability to "process simple or routine visual material without making errors" was borderline-impaired. R. 716. In Dr. Larery's opinion, Plaintiff's "pattern of neuropsychological functioning" suggested a cognitive disorder NOS. Dr. Larery particularly emphasized the "multitude of neurological risk factors" present in Plaintiff's case, including "renal failure secondary to ingestion of a toxic substance, HIV, and a brief loss of consciousness." R. 718. She especially highlighted the connection between Plaintiff's cognitive impairment and HIV positive status, moreover, writing: "Individuals who are HIV positive are at increased risk for cognitive problems due to the potential for the virus to cross into the brain." R. 719. Noting that Plaintiff's "perception of symptom severity [was]

---

[16] This assessment may be contrasted with non-examining physician Dr. Boulos's 2011 assessment, discussed in the prior section, that Plaintiff would only experience "mild" difficulties with work activities. R. 558.

15

exaggerated," Dr. Larery nonetheless concluded that Plaintiff's "cognitive impairments [were] genuine." R. 718.

On November 14, 2013, at the request and expense of the DARS, Dr. Farzana Sahi, M.D. ("Dr. Sahi") conducted a physical examination of Plaintiff. Plaintiff reported fatigue, cardiovascular palpitations, pain in his extremities, back pain, and depression. Dr. Sahi observed "tenderness" and "spasm" in Plaintiff's back. She reported that Plaintiff displayed "difficulty bending and squatting" and a decreased range of motion. Dr. Sahi concluded that Plaintiff experienced "severe restrictions based on his fibromyalgia, fatigue from HIV, and depression." R. 660. In particular, Plaintiff could frequently lift and carry up to ten pounds, but could never lift or carry more than ten pounds. Plaintiff could not sit, stand, or walk for a full eight hour day. He could "never" engage in postural activities, such as climbing stairs and ramps, climbing ladders or scaffolds, balancing, stooping, kneeling, crouching, or crawling. Finally, Dr. Sahi assessed that Plaintiff could not perform daily activities such as shopping, traveling without a companion for assistance, and using standard public transportation. R. 661–72.

## C. The ALJ's Findings and Conclusions

The ALJ's August 15, 2014 decision contains the following findings of fact and conclusions of law:

1. Plaintiff met the Act's insured status requirements through June 30, 2015. R. 17.

2. Plaintiff has not engaged in substantial gainful activity since January 1, 2007, the alleged onset date of his disability. *Id.*

3. Plaintiff has the following severe impairments: HIV, fibromyalgia, mild degenerative disc disease, degenerative joint disease of the shoulder, mild degenerative disc

disease of the cervical spine, status post fusion of the left clavicle, a history of opioid dependence, and major depression. R. 18.[17]

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

5. Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) and C.F.R. § 416.967(b), although he is limited to occasional postural maneuvers such as kneeling, stooping, crouching, crawling, or climbing stairs and ramps; he must avoid climbing ladders, ropes, and scaffolds; he is limited to occasional overhead reaching; and he is limited to unskilled work. R. 19. Specifically, Plaintiff cannot lift more than 25 pounds. R. 21.

6. Plaintiff is unable to perform any past relevant work. R. 22.

7. On the alleged disability onset date, Plaintiff was 37 years old, which is defined as "a younger individual age 18-49." R. 23.

8. Plaintiff has at least a high school education and is able to communicate in English. *Id.*

9. Transferability of job skills is not at issue in this case because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not Plaintiff has transferable job skills. *Id.*

10. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. *Id.*

---

[17] Status post fusion refers to a joint's failure to fuse completely.

11. Plaintiff has not been under a disability, as defined in the Act, from January 1, 2007

through August 15, 2014 (the date of the ALJ's decision). R. 24.

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is

'material' if its resolution in favor of one party might affect the outcome of the lawsuit under

governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (internal

quotation marks and citation omitted). "A genuine issue of material fact exists when the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." *Quality*

*InfusionCare, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 728 (5th Cir. 2010) (internal

quotation marks and citation omitted).

### B. Standard of Review

The Act provides that an individual may seek judicial review of "any final decision of the

Commissioner of Social Security made after a hearing to which he was a party." 42 U.S.C.

§ 405(g). In performing that review:

> The court shall have power to enter, upon the pleadings and transcript of the
> record, a judgment affirming, modifying, or reversing the decision of the
> Commissioner . . . , with or without remanding the cause for a rehearing. The
> findings of the Commission . . . as to any facts, if supported by substantial
> evidence, shall be conclusive . . . .

*Id*.

Judicial review of the Commissioner's denial of disability benefits is limited to two

inquiries: first, whether the decision is supported by substantial evidence; and second, whether

the Commissioner applied the proper legal standards in evaluating the evidence. *See id.* ("The

findings of the Commissioner . . . as to any facts, if supported by substantial evidence, shall be conclusive . . ."); *accord Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). "Substantial evidence" means "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." *Id.*

A reviewing court may not reweigh the evidence in the record, retry the issues *de novo*, or substitute its judgment for that of the Commissioner, even if the evidence preponderates against the Commissioner's decision. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). Conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Id.* At the same time, however, judicial review must not be "so obsequious as to be meaningless." *Id.* (internal quotation marks and citation omitted). The "substantial evidence" standard is not a rubber stamp of the Commissioner's decision. It involves more than a search for evidence supporting the Commissioner's findings. *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985); *Singletary v. Brown*, 798 F.2d 818, 822–223 (5th Cir. 1986) ("[T]he substantial evidence test does not involve a simple search of the record for isolated bits of evidence which support the [Commissioner's] decision."). Rather, a reviewing court must scrutinize the record as a whole, taking into account whatever in the record fairly detracts from the weight of the evidence supporting the Commissioner's findings. *See Cook*, 750 F.2d at 393. A court "may affirm only on the grounds that the Commissioner stated for [the] decision." *Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014).

### III. THE ALJ'S DECISION

#### A.    The ALJ's Disability Determination

To be entitled to Social Security disability insurance benefits, a claimant must

demonstrate that he is "disabled" under the Act. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). A claimant is disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). As the ALJ stated in her decision, R. 16–17, the Commissioner uses a five-step inquiry in determining whether a claimant is disabled, asking the following questions in sequence:

(1)   Is the claimant presently engaged in "substantial gainful activity"? (Step One)

(2)   Does the claimant have an impairment or combination of impairments that is "severe"? (Step Two)

(3)   Are the claimant's impairments of a severity that meets or equals the criteria listed in the applicable regulations? (Step Three)

(4)   Considering the claimant's residual functional capacity, do the impairments prevent the claimant from performing past relevant work? (Step Four)

(5)   Considering the claimant's residual functional capacity and his age, education, and work experience, do the impairments prevent the claimant from performing other work? (Step Five)

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a). The claimant bears the burden of proof on the first four steps of this inquiry. *Perez*, 415 F.3d at 462. At Step Five, the burden shifts to the Commissioner, who must show that the claimant can perform other substantial work in the national economy. If the Commissioner makes that showing, the burden shifts back to the claimant, who must rebut the Commissioner's finding. *Id.* Before moving from Step Three to Step Four, the Commissioner assesses a claimant's RFC based on "all the relevant medical and other evidence" in the record. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). A claimant's RFC is the most he can still do despite his physical and mental limitations. *Id.* §§ 404.1545(a)(1);

416.945(a)(1). At Step Four, the Commissioner uses the claimant's RFC to determine whether the claimant can still perform past relevant work. At Step Five, the Commissioner uses the claimant's RFC to determine whether the claimant can perform any other type of work in the national economy. *Perez*, 415 F.3d at 462.

In this case, at Step One the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2007, the alleged onset date of his disability. R. 17. At Step Two, the ALJ found that Plaintiff had the following severe impairments: HIV, fibromyalgia, mild degenerative disc disease, degenerative joint disease of the shoulder, mild degenerative disc disease of the cervical spine, status post fusion of the left clavicle, a history of opioid dependence, and major depression. R. 18. However, the ALJ concluded that Plaintiff's other documented impairments, including a cognitive disorder NOS, an anxiety disorder NOS, and borderline intellectual functioning, were "not supported by sufficient evidence to find they are severe." The ALJ found that these impairments did "not impose more than a slight limitation upon [Plaintiff]'s ability to perform basic work-related activities. *Id*. At Step Three, the ALJ found that Plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id*. In particular, the "severity of [Plaintiff]'s mental impairments, considered singly and in combination, [did] not meet or medically equal the criteria of listing 12.04." *Id*. This finding was based on the ALJ's assessment that Plaintiff's mental impairments did not result in at least two of the following, as required by listing 12.04: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation." The ALJ found that while Plaintiff had "moderate difficulties" with

"concentration, persistence, or pace," he had only mild difficulties with activities of daily living and social functioning, and no episodes of decompensation. *Id*.

Next, the ALJ assessed Plaintiff's RFC. She determined that Plaintiff was able to perform "light work . . . except limited to occasional postural maneuvers such as kneeling, stooping, crouching, crawling, or climbing stairs or ramps; must avoid climbing ladders, ropes, and scaffolds; limited to occasional overhead reaching; and unskilled work." R. 19. Based on this assessment of Plaintiff's RFC, at Step Four, the ALJ determined that Plaintiff was unable to perform any past relevant work. R.22. Finally, at Step Five, the ALJ found, based on Plaintiff's age, education, work experience, and RFC, that Plaintiff could perform "jobs that exist in significant numbers in the national economy." R. 23.

As an administrative factfinder, the ALJ is entitled to significant deference in deciding the appropriate weight to accord the various pieces of evidence in the record, including medical opinion evidence. *See Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). However, "the ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports [her] position." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). Moreover, "[t]he ALJ cannot reject a medical opinion without an explanation," nor is she "at liberty to make a medical judgment regarding the ability or disability of a claimant to engage in gainful activity, where such inference is not warranted by clinical findings." *Id*.

Agency regulations set forth detailed rules for evaluating medical opinions regarding a claimant's impairments. The ALJ must consider six factors when deciding the weight to accord a medical opinion. Chief among these factors is whether the physician has an examining relationship with the claimant. The medical opinion of a physician who has examined the claimant, even if the physician does not have a treatment relationship with the claimant, is

entitled to greater weight. 20 C.F.R. § 416.927(c)(1). ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.").

Next, the ALJ must consider whether the physician has a treatment relationship with the claimant. The medical opinion of a physician who has a treatment relationship with the claimant is entitled to additional weight. 20 C.F.R. § 416.927(c)(2) ("Generally, we give more weight to medical opinions from your treating source . . . If we find that a treating source's medical opinion . . . is well-supported by medically acceptable clinical and laboratory diagnostic techniques, we will give it controlling weight."). The "longer the treating source has treated" the claimant, the more weight the ALJ must give to the treating source's medical opinion. 20 C.F.R. § 416.927(c)(2)(i). If the treating source has "reasonable knowledge" of the patient's condition, the ALJ must give more weight to the treating source's medical opinion. 20 C.F.R. § 416.927(c)(2)(ii). However, the ALJ may give less weight to a treating source's medical opinion when the treating source's statements are brief and conclusory; not supported by medically acceptable clinical, laboratory, or diagnostic techniques; or otherwise unsupported by the evidence. *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000) (noting that even a treating physician's opinion may be discounted on such a record).

Third, the ALJ must consider the supportability of a physician's medical opinion. The ALJ should give greater weight to the medical opinion of a physician if that opinion is supported by "medical signs and laboratory findings." The weight afforded the medical opinions of non-examining physicians, in particular, depends on the extent to which they "provide supporting explanations for their medical opinions." The ALJ must consider whether a non-examining

physician has considered "all pertinent evidence . . . including medical opinions of treating and other examining sources." 20 C.F.R. § 416.927(c)(3).

Fourth, the ALJ must consider the consistency of a medical opinion with the record as a whole. 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). Fifth, the ALJ should afford greater weight to the medical opinion of a specialist. 20 C.F.R. § 416.927(c)(5). Sixth, the ALJ may consider other factors, including the familiarity of a physician with disability programs and the claimant's disability benefits case record. 20 C.F.R. § 416.927(c)(6).

Here, the ALJ failed to follow Agency guidelines for evaluating medical opinion evidence. First, the ALJ afforded "significant weight" to the medical opinions of Dr. Boulos and Dr. Saif, both non-examining physicians, R. 22, while giving less weight to the medical opinions of examining sources. Agency guidelines clearly state, as discussed above, that the medical opinions of examining physicians should be given greater weight than the medical opinions of non-examining physicians. 20 C.F.R. § 416.927(c)(1).

The ALJ's failure to adhere to this guideline is particularly evident in her affording "lesser weight" to the medical opinion of Dr. Sahi, an examining physician. R. 21. Dr. Sahi concluded that Plaintiff experienced "severe" restrictions as a result of his medical conditions. R. 660. The ALJ found that the "restrictions [Dr. Sahi] opined seemed to be based on the claimant's subjective complaints." Specifically, the ALJ concluded that there was "no clinical evidence to support the claimant's allegation that he cannot bend his back." R. 21. However, Dr. Sahi's assessment was based upon range of motion tests conducted during her examination of Plaintiff. *See, e.g.*, *Mercado v. Lee*, No. 04 CIV. 7166 (PGG), 2008 WL 4963985, at *4 (S.D.N.Y. Nov. 21, 2008) ("courts have also considered passive range of motion tests based on objective criteria,

such as straight-leg raising tests and observations of spasms, as objective evidence because they are not based on the patient's complaints of pain"). While Dr. Sahi's report did not indicate whether the range of motion tests were passive (as opposed to active), the ALJ had an independent duty to "fully and fairly" develop the facts pertaining to Plaintiff's claim. *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995); *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). In finding no clinical evidence to support the assertion that Plaintiff could not bend his back, moreover, the ALJ ignored the medical opinion of Dr. Ahmed, who clearly stated after examining Plaintiff in 2011—prior to the worsening of Plaintiff's physical impairments—that Plaintiff could only "handle light weights if he [did] not have to bend his back." R. 543.

Instead, the ALJ gave greater weight to the medical opinions of Dr. Boulos and Dr. Saif, both of whom concluded, without examining Plaintiff, that the record did not support his reported physical symptoms and resultant limitations. R. 564, 571. The ALJ determined that Plaintiff could "perform light, simple work" based on the medical opinions of Dr. Boulos and Dr. Saif, even though the more recent medical opinions of examining physicians, such as Dr. Sahi, contradicted this finding. R. 22. Insofar as the ALJ failed to acknowledge the objective evidence underlying Dr. Sahi's medical opinion, she failed in her duty to "fully and fairly" develop the facts underlying Plaintiff's claim and her decision is not supported by substantial evidence. *Pierre v. Sullivan,* 884 F.2d 799, 802 (5th Cir. 1989) (per curiam).

Moreover, the ALJ erred in affording greater weight to the medical opinions of Dr. Boulos and Dr. Saif because their opinions were not consistent with the medical record as a whole. Agency guidelines stipulate that the ALJ must consider the consistency of any medical opinion with the medical record as a whole. 20 C.F.R. § 416.927(c)(4). Neither Dr. Boulos nor Dr. Saif properly considered "all pertinent evidence . . . including the medical opinions of

treating and other examining sources." 20 C.F.R. § 416.927(c)(3). For example, Dr. Boulos assessed that Plaintiff experienced a "mild degree" of restriction in activities of daily living. R. 558. This assessment is inconsistent with the medical record as a whole, which clearly demonstrates the severe curtailment of Plaintiff's daily activities due to his impairments, and the progression of his impairments over time.

Likewise, Dr. Saif assessed that Plaintiff could stand, walk, and sit for six hours per day. R. 567. This finding is also inconsistent with the medical record as a whole. For example, Dr. Ahmed concluded that Plaintiff could only "sit for long periods of time" if he was allowed to take periodic breaks and only "stand for [a] moderate length of time." R. 543. Plaintiff testified, moreover, that it was "hard to wash [his] body"—an activity that unquestionably requires fewer than six hours of standing—because he could not "stand very long in [the] shower." R. 286. If Plaintiff could not briefly stand to shower, it is doubtful that he could stand for six hours per day in a work environment. Given that the medical opinions of non-examining physicians were inconsistent with the medical record as a whole, therefore, the ALJ improperly gave greater weight to their assessments of Plaintiff's impairments. As a result, the ALJ's determination constituted impermissible "picking and choosing" among the evidence in Plaintiff's medical record and is not supported by substantial evidence.

Second, the ALJ erred in failing to properly account for the side effects of Plaintiff's prescribed medications. The ALJ has a duty to consider the effect of medication side effects in determining the extent of a claimant's impairment. "[I]f an individual's medical treatment [which includes any prescribed medication] significantly interrupts the ability to perform a normal, eight-hour work day, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity." *McNeil v. Astrue*, No. 4:07–cv–3664,

2009 WL 890553, at *12 (S.D. Tex. Mar. 31, 2009) (Milloy, J.) (internal quotation marks and citations omitted; brackets in original), *adopted*, 2009 WL 1451707 (S.D. Tex. May 22, 2009) (Rosenthal, J.). In particular, Agency guidelines require the ALJ to consider the "'type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [his] pain or other symptoms.'" *Crowley v. Apfel,* 197 F.3d 194, 199 (5th Cir. 1999) (quoting 20 C.F.R. § 404.1529(c)(3)(iv)).

Dr. Pellegrini, who assessed Plaintiff as having a GAF score of 49, concluded that he would have "significant difficulty sustaining concentration and persisting in work related activities at a reasonable pace," as well as "moderate" difficulty interacting with supervisors and coworkers. R. 652–53. The ALJ acknowledged that Plaintiff's GAF score indicated "serious restrictions in occupational, social, and/or education functioning." R. 21. However, the ALJ ultimately gave little weight to Dr. Pellegrini's assessment of Plaintiff, concluding that Plaintiff's GAF score was artificially lowered due to the side effects of his many prescribed medications. *Id*. Similarly, the ALJ gave less weight to Dr. Larery's assessment that Plaintiff possessed a borderline-impaired overall level of intellectual functioning. Dr. Larery, who emphasized that Plaintiff's use of benzodiazepines "likely contribute[d] to confusion, poor concentration, and cognitive 'foginess' [sic]," R. 719, nonetheless concluded that Plaintiff's "cognitive impairments [were] genuine." R. 718. The ALJ discounted Dr. Larery's medical opinion, finding that Plaintiff's test results were "consistent with over reporting of symptoms." "Playing doctor" rather than impartially evaluating Plaintiff's medical record in its entirety, the ALJ concluded that the results provided evidence of Plaintiff's medication-induced "inattention" rather than "lack of intelligence." R. 21.

It is true that evidence of drug-seeking behavior can undermine the credibility of a

claimant and impact the relative weight assigned to various pieces of medical opinion evidence. *See, e.g.*, *Berger v. Astrue*, 516 F.3d 539, 545-46 (7th Cir. 2008). However, the present case is not one in which Plaintiff's medication history justifies the ALJ's discounting the medical opinions of examining sources. Over the course of many years, Plaintiff's treating physicians repeatedly prescribed opioids to treat his documented history of chronic pain and fibromyalgia. His treating physicians accepted Plaintiff's dependence on opioids as a necessary evil in light of the severity of his comorbid medical conditions. Dr. Vanek's characterization of Plaintiff's opioid dependence as iatrogenic, or the unintended result of his medical treatment plan, underscores this point. R. 491–92. Another clinician at Legacy characterized Plaintiff's opioid dependence as "stable." R. 597. Finally, Dr. Masters, the only treating physician to diagnose Plaintiff with "opioid abuse," rather than an opioid dependence, made clear during subsequent follow up appointments that Plaintiff had only a "remote" history of opioid abuse. R. 622–23, 729, 768. In half of a dozen years, only two physicians described Plaintiff's behavior as "drug-seeking." R. 115, 497. The majority of his treating physicians did not characterize Plaintiff's behavior in such terms, recognizing the therapeutic value of prescribed opioids in treating Plaintiff's medical conditions. The ALJ therefore erred when she afforded lesser weight to the medical opinions of Dr. Pellegrini and Dr. Larery on the basis that Plaintiff's medication history rendered their assessments invalid.

Third, the ALJ erred in substituting her own opinions for those of medical experts. The ALJ was "determined to deny [Plaintiff's] claim regardless of the evidence presented" because of her personal opinions and biases, which she allowed to color her assessment of the legitimacy of Plaintiff's impairments. ECF No. 8 at 5–6. While Plaintiff's medical record clearly demonstrates a significant worsening of his physical and mental impairments over time, the ALJ

doubted the veracity of this pattern of deterioration, finding "minimal evidence of an intervening event that would produce such dramatic changes." R. 21. She characterized Plaintiff's medical record as consisting of "frequent outpatient records of subjective complaints, but little objective evidence to substantiate [Plaintiff's] allegations," even though both treating and examining physicians, over the course of many years, repeatedly provided such objective evidence of the nature and extent of Plaintiff's physical and mental impairments. R. 22. Moreover, the physicians continued to *treat* the Plaintiff based on his descriptions of his medical condition and pain. His complaints over time were consistent; he told the same story of a work related injury in 1999 and a lover-induced poisoning in 2003 that severely impacted his overall health, combined with HIV, which he was financially unable to treat, and resulted in chronic pain and a progression of worsening impairments. The medical records as a whole are utterly consistent in this regard.

The ALJ allowed her personal opinions about the causes and appropriate treatment of drug dependence and addiction to improperly influence her in her role as an administrative factfinder. In her decision, she highlighted those facts and medical opinions that portrayed Plaintiff as a drug addict undeserving of disability benefits. She emphasized that Plaintiff had once tested positive for opioids, while failing to mention, by way of explanation, that Plaintiff's treating physicians had prescribed those opioids to him to treat his chronic medical conditions. R. 20. She implied that Plaintiff would find relief from his depression if he overcame his opioid dependence, while failing to acknowledge that his depression was in fact the result of over a decade of chronic pain and the attendant severe limitations on his daily activities, leisure pursuits, and social life. As Plaintiff testified: "I'm very depressed . . . because I used to have a normal life. And now I have no normal life anymore." R. 83. She highlighted Plaintiff's recent

cruise to Jamaica and purported ability to drive independently as evidence of the dubious nature of his impairment. R.20. However, she failed to clarify that Plaintiff spent the entirety of the cruise in the ship's hospital with pneumonia, had not traveled anywhere else in the past three years, R. 45, and had been involved in at least five motor vehicle accidents in recent years, suggesting that Plaintiff's driving ability had been progressively impaired by his worsening medical conditions. R. 541. For an ALJ to allow her preconceived opinions regarding opioid dependence and drug addiction to influence her denial of disability benefits is inappropriate. It demeans the principles of justice upon which our system of administrative adjudication is based. This is especially true when scientists have shown how powerful neurochemical forces contribute to opioid dependence.[18]

**D.      Decision to Reverse and Award Benefits**

The remaining issue is whether the case should be remanded to the Commissioner or reversed with a direction to calculate and award benefits to Plaintiff. The decision whether to reverse and remand for further administrative proceedings, or to reverse and immediately award benefits, is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172 (9th Cir. 2000). Generally, the court must remand to the agency for further proceedings. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). However, the Social Security Act grants additional flexibility, empowering courts to affirm, modify, or reverse a decision of the Commissioner "with or *without* remanding the cause for rehearing." 42 U.S.C. §405(g) (emphasis added). Every Court of Appeals has recognized the freedom of courts to reverse and remand a decision of the Commissioner with instructions to immediately calculate and award benefits. *See, e.g.*, *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 730 (6th Cir. 2014); *Jones v. Astrue*, 650 F.3d 772 (D.C. Cir.

---

[18] *E.g.*, Thomas R. Kosten, M.D., et al., *The Neurobiology of Opioid Dependence: Implications for Treatment*, SCIENCE & PRACTICE PERSPECTIVES 13, 13 (2002).

2011); *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011); *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006); *Hines v. Barnhart*, 453 F.3d 559, 567 (4th Cir. 2006); *Seavey v. Barnhart*, 276 F.3d 1 (1st Cir. 2001); *Williams v. Apfel*, 204 F.3d 48 (2d. Cir. 2000); *McQueen v. Apfel*, 168 F.3d 152, 156 (5th Cir. 1999); *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984); *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984). The court may direct an immediate award of benefits where the record enables the court to "determine definitively that the claimant is entitled to benefits." *McQueen*, 168 F.3d at 157.

The Fifth Circuit has not developed a framework for determining whether this standard has been met. However, other courts have articulated the circumstances under which an immediate award of benefits may be justified. "[T]he decision to . . . award benefits should be made only when the administrative record has been fully developed and when substantial evidence in the record as a whole indicates that the claimant is disabled and entitled to benefits." *Morales v. Apfel*, 225 F.3d 310, 320 (3rd Cir. 2000). *See also*, *Gentry*, 741 F.3d at 730 (holding that courts should consider whether all factual issues have been resolved, whether the proof of disability is strong, and whether opposing evidence is lacking such that remand would "merely involve the presentation of cumulative evidence").

Here, reversal of the Commissioner's decision and an immediate award of benefits is warranted. In the course of two hearings the ALJ conducted and the Appeals Council reviewed, the record in Plaintiff's case has been fully developed. Multiple treating and examining physicians have, over the years, attested to the incontrovertible fact of Plaintiff's severe physical and mental impairments. They have, moreover, documented the deterioration of Plaintiff's impairments since he first applied for disability benefits. In conversations with treating and

examining physicians and in his own testimony before the ALJ, Plaintiff has consistently articulated the disabling nature and impact of his impairments. Plaintiff has repeatedly described his near-constant, excruciating pain, the resulting curtailment of his daily activities, and his inability to maintain employment. Contrary to the ALJ's finding, substantial evidence in the record as a whole does clearly indicate that Plaintiff is genuinely disabled and entitled to benefits. He has waited for the benefits to which he is entitled, moreover, for over five years. Remand for further administrative proceedings would merely necessitate the rehashing, for the third time, of the ways in which Plaintiff's disability has negatively impacted his life and livelihood.

## VI. CONCLUSION

Plaintiff's motion for summary judgment is **GRANTED**, and the Commissioner's motion for summary judgment is **DENIED**. This case is **REVERSED** and **REMANDED** to the Commissioner for an immediate award of benefits.

Signed on September 15, 2017, at Houston, Texas.

_Dena Palermo_

**Dena Hanovice Palermo**
**United States Magistrate Judge**